to our third case, Passwater v. Pretorius, Appeal No. 25-1149. Mr. Burkhart, whenever you're ready. May it please the court, Dr. Ribiteau diagnosed Brad, a paranoid schizophrenic, with a clear and imminent risk of substantial suicide and self-harm, ordered emergency psychotropic medication, and then abandoned his medical judgment. As a result, the very risk of harm he diagnosed occurred, and Brad ripped out his testicles, gouged out his eyes, causing permanent blindness. Brad designated sufficient evidence of deliberate indifference to convince a reasonable juror to survive summary judgment. If you look at the evidence Brad designated, one is the admission by Dr. Ribiteau that he undertook no post-medication assessment. Dr. Ribiteau's deposition testimony confirmed the standard of care to review post-medication assessment to determine whether the medication is helpful and the behavior is improving. So, as I understand it, Dr. Ribiteau was providing professional services remotely. He was located in Florida, is that correct? Yes, Your Honor. And the typical procedure, as I understand it at least, is that he then would rely upon the nurses and the professionals at the facility to do any necessary follow-up and to alert him if anything, you know, rises to a level of consequence. And it seems, didn't he do that here? No. There's no evidence in the record to indicate he undertook any assessment, any communication. No, no, no, but that he relied on the staff at the facility to do the follow-up as he usually does. No. He designated no evidence to that fact, but the point is that's one source of information is the nurse communicating information. Another source could be the mental health professional communicating information. He had access to the EMR, electronic medical records, which showed Mr. Link's going in roughly an hour and a half after the medication, show his psychosis had worsened. And so he had the opportunity and he had the duty. He's a medical provider. He's the only one who can issue new orders for medication to stave off the imminent risk of suicide. So yes, he can certainly rely upon them, but in this case, there's no evidence he did because there's no evidence that any of the nurses undertook any action subsequent to the administration of that medication. How does that make him though deliberately indifferent if he was never notified of any problem? Because he was the one that diagnosed Brad of an imminent risk of self-harm. He's the one who... But what was he supposed to do? I mean, I mean, I understand the facts are horrible in this case, but what was he supposed to do, fly up here and sit outside his cell? He was in Florida. He was able to make that under the IDOC policy. He had to meet these requirements before ordering the emergency medication. He did that review and made that determination based upon whatever information he had at that time. After ordering the medication, he just doesn't get to go out and play golf with his buddies and just hope that somebody takes care of Brad. Somebody can diagnose him.  My doctors do. Well. I don't know. I don't know. What was he supposed to do? What he does is he can look in the EMR and he can see. Mr. Links went down there an hour and a half later. His psychosis is worsening. The medication's not working. He has the opportunity to communicate with a nurse. The policy even required the nurse to get back to him. You're imposing an affirmative obligation on the physician to initiate the contact after the medication had been administered. Am I right? An affirmative obligation. He cannot rely on the fact that the caregivers on site will contact him if he's needed. He has the right to rely upon other people, but he has to ensure that that's actually done. He's the medical provider who has the affirmative duty to ensure that that patient is not going to take that. So after prescribing what I think everyone agrees was a proper medication regimen for a patient and working remotely under a protocol where he knows there are medical people on site, although not physicians, he still has, he's still deliberately indifferent if he doesn't initiate the inquiry. Is that your position? Position is yes. He has the affirmative duty. Once he administers emergency psychotropic medicine because of an imminent risk of self-harm to follow up to see as he testified himself, the standard of care requires to assess whether the medication is helpful or not. Look at it this way. What, what if he issued, what if he, what if he, what if he ordered a knee brace for a torn ACL? Would he have an affirmative obligation to ensure that the inmate wore it? No. What is the difference? The difference is simply as we indicated in our briefing. This isn't a case where you're giving somebody antibiotics because they have strep throat and says, all right, maybe come back in two weeks. What's the standard? How would we write an opinion that says if it's, if it's, I mean, is it, is it just limited to mental health medication? Is it what, what, how do we say the doctor in this case is deliberately indifferent if he doesn't follow up with the patient to ensure that the medication is working? But in another case, if he prescribed some pain medication for a toothache, he's not deliberately indifferent. Because this case involves the objective medical need of suicide, an imminent risk of suicide that he diagnosed. And so yes, he has that duty to follow up because the courts look at the totality of care. And to your point, Judge, no one's disputing the care leading up to the administration of the medication was appropriate. No one's disputing after the self-harm and he was removed from the cell and taken to the hospital, that that care was appropriate. But we're looking at totality and the totality is from the time after he administered the medication to the time of the self-harm, there was a complete lack, absence of professional judgment. The standard of care, obviously the standard of care may be different with the constitutional floor, but here we think they're the same because both Dr. Ribbito himself and Brad's independent expert testified the duty exists once you administer, in this context, emergency psychotropic medication because of an imminent risk of self-harm, you've got to follow up to see if it's helpful or not. Because we know if it's not helpful, the worst thing is going to happen. This guy can suffer self-harm like he did or worse, suicide. And that's what makes this case different than your knee brace for a torn ACL. Can I? Oh, I'm sorry. Go ahead. You know, you talk about kind of what he should have done in standard of care, but obviously we all know that the governing standard to establish a constitutional violation is much more rigorous, right, is the plaintiff would have to show that no minimally competent professional would have acted in the way that Dr. Ribbito did. The medical expert that plaintiff presented before district court does not opine on that standard. It just says that what Dr. Ribbito did did not meet best practices. I guess my question is, do you have any authority to support your proposition that what Dr. Ribbito did is something that no minimally competent professional would do? I think that goes to the deliberate indifference issue. A jury gets to decide that. We're on summary judgment. The facts and inferences of the jury are the same. Well, I mean, the jury gets to decide that assuming that a reasonable jury could find that Dr. Ribbito's actions didn't meet that standard. And I guess my question is, can you point to anything in the record from which a reasonable that's way lower than professional negligence? Yes, Dr. Ribbito's own testimony where he said the standard of care after you administer that medication is to follow up to see if the medication is helpful and it's improving. But again, we're talking about the standard of care, and the standard of care is here for a negligence claim, but the standard for constitutional violation is like down here. And so I'm asking you if there's anything in the record from which a jury could find that Dr. Ribbito's actions weren't necessarily up here, but actually were lower than down here. Yeah, I think what we've designated. I mean, I think his admission that he did nothing. The admission that he could have reviewed the EMR to see the condition was worsening. He didn't. His own testimony. I mean, what we're looking at here is, did you know of a substantial risk of suicide? Yes. Were you intentionally indifferent to that? Absolutely. What did he do? He doesn't designate anything that he did post-administration. So I'm thinking that. I'm sorry. Could we talk about Deputy Warden Pretorius for a bit? So you bring up this kind of two-hour shift, right? And when I look at that report of this horrible incident that happened, the shift that Mr. Fox, I think, was there, the custodian, his shift started at noon, at 146, Mr. Passwater starts gouging at his eyes. At 156, the video shows that he started grabbing at his crotch area and that blood can be seen at that time. If Mr. Fox had been complying with even the two-hour shift standard, wouldn't he have noticed those things? And so isn't it really the fox's refusal and inability to kind of follow the procedures to correctly observe Mr. Passwater that brings upon this horrible injury as opposed to the two-hour shift? Because it seems like the actions and even the bleeding started within that first two-hour period. Yeah, I think what you're asking about is there's some intervening cause that maybe breaks causation. I think that's a much more artful way of putting it than me. Thank you. But I would say this. First of all, neither defendant has made that argument. And this court has made clear it won't make arguments for a party the party didn't make for itself. Secondly, neither one has asserted some kind of non-party defense saying, well, you're actually the one responsible, not me. I think thirdly, the injury was foreseeable. The entire policy was aimed at inmate safety. And the basis of it was for four hours, you just got to stand up and look through this small glass window in the door, you become complacent. So the very risk, the very harm that that policy was meant to protect, that occurred. But the policy wasn't meant to protect inattention within that two hours, right? I mean, that's the whole point of the two hours. And Mr. Fox, as I understand it, just people, he'd be sitting down, some custodial officers would come by, see him standing down, tell him to get up. He would get up for a little bit, but then he would sit back down, even within the two hours. And so, I mean, let's say for purposes of argument that Mr. Passwater started really harming himself at the one-hour stage, and Mr. Fox was just not paying attention, he was sitting down. Would you still argue that it was the failure to comply, a systematic failure to comply with the two-hour policy that caused the injury? Yes, because I think the whole purpose of the policy is recognizing the email chain, is that these people who have to stand for four hours become complacent. So you know they may be sitting down at some point in time. So if you're there for a two-hour period, you have a better chance of being attentive, and then you have shift changes during that period of time right when part of the harm occurred. And so yes, I think that it would still show that it was a but-for, approximate cause, failure to enforce this policy. Mr. Burkhardt, perhaps you could refresh our recollections. Does Indiana state law provide any recourse for your client in terms of monetary damages? There's nothing in the record to indicate that, Your Honor. But it's a matter of law. As an attorney in Indiana, do you have an Indiana remedy for this kind of thing? I do not know the answer to that question. Okay, well, well. And back to your comment, Judge Ali, in terms of intervening cause, causation is an issue generally for the jury. So that, again, these designated facts and inferences, which we believe suffice to allow a reasonable jury to rule in his favor and to address causation. I think generally you're right. I guess your theory in this case, to bring Deputy Warden Pretorius, though, into the fold, is that she was aware that people weren't following this two-hour policy, that inmate custodians were being allowed to observe people in these precarious situations with suicidal ideation more than two hours. And so, therefore, she was a little bit indifferent to that fact that people weren't abiding within the two hours, and that that's what kind of caused the injury. And I guess I see that theory as being a little bit problematic because of the timing that took place in this case. That was just my point. Okay, so my time is up. Okay, thank you. Thank you, Mr. Burkhart. Okay, Ms. Johnson. Good morning, Your Honors. May it please the Court of Rachel Johnson on behalf of Dr. Rippetoe. The district court was correct in this matter in concluding that no reasonable jury would find that Dr. Rippetoe acted with deliberate indifference in this matter. Given that he had every reason to believe that the medical staff who were physically present at the Plainfield Correctional Facility on April 16th would abide by the policies in place at the facility. To establish the Eighth Amendment deliberate indifference in this case, a plaintiff must prove the two elements. First, that the harm to the plaintiff was objectively serious. And the second, that an official was deliberately indifferent to the plaintiff's health or the safety. We don't have any dispute about the first prong of the case, that the plaintiff had an objectively serious condition, as was in the record already. However, there is insufficient evidence in the record to support the second prong of the test, that being that an official was deliberately indifferent to Mr. Passwater's health or safety. Is there anything in the record that would inform us as to what Dr. Rippetoe's kind of usual practice was in situations like this? Does he check in with the nurses after he prescribes medication like this to a patient? Does he expect them to check in with him after a certain period of time? I mean, is there kind of a usual practice with him and the nurse staff as to kind of reporting back and forth on patients? I don't know that there's much by way in the record. During his deposition, he testified that he stays in good communication with the staff and that providing orders for involuntary psychotropic medication does happen. You know, there is testimony that he has been familiar with Mr. Passwater. He's been an active treater for Mr. Passwater for several months, so he was familiar with Mr. Passwater. Mr. Passwater has actually had this type of medication prescribed to him in the past. So other than prescribing and staying in touch with the nursing staff on a regular basis, he's had a contract with Plainfield Correctional for a number of years prior to this incident on April the 16th. I guess what I'm getting at is that there isn't a standard practice that's like the nurses are supposed to check in with him every hour about a patient that receives a particular type of drug. Not that I'm aware of in the record. However, there is a policy in place for how often the nursing staff are supposed to monitor these patients at the facility after the medication is administered. And did that take place? Did the nurses here follow that procedure with regard to Mr. Passwater? That was Dr. Ripoteau's understanding. Again, he had no reason to believe that that was not the... I understand that was his understanding, but I'm wondering whether the record establishes whether the nurses did, in fact, comply with the policy with regard to Mr. Passwater. That is not. My understanding is that, yes, the nursing staff was monitoring Mr. Passwater once the medication was administered. Dr. Ripoteau's actions on 4-16 were appropriate in response to Mr. Passwater's condition. But, again, Dr. Ripoteau not being on site, there was only so much that he could do. In response to Judge Kirsten's question earlier, what more could Dr. Ripoteau do? He was not on site, but he was, as he testified during his deposition, staying in proper communication with the nursing staff. Mr. Passwater was on suicide watch. There was a suicide companion placed directly outside of his cell. Correctional officers were performing runs in the cell house. He was under direct supervision in the placement in the cell house. And Dr. Ripoteau had every reasonable expectation that Mr. Passwater would be appropriately monitored after the order for the involuntary Haldol medications. For Mr. Passwater to allege that there is no evidence in the record that he would follow up or have any appropriate communication or monitoring of Mr. Passwater, that's simply untrue and is not supported by the record. Dr. Ripoteau was appropriate in relying on the safeguards in place at the facility. Again, Passwater was located in a camera cell with the suicide watch companion in place. The IDOC policies are in place regarding the monitoring of the patients in the suicide watch placement, so they could be followed by the staff at the facility, the mental health staff, the nursing staff, to make sure that appropriate placements and safeguards were in place for them due to Dr. Ripoteau's placement, not only outside of the facility, but he was outside of the state. This was known to all in place, making sure that Dr. Ripoteau was informed as he needed to be. He had no reason to believe that these things were not happening. And again, if nobody is letting him know, he only knows what he knows. That is what he testified to at his deposition. Plaintiff's plain reading of the argument of the IDOC policies makes it known that the policies that were in place were appropriate for not only Mr. Passwater, but Dr. Ripoteau had no reason to be concerned about the communication with the facility as he testified that nursing staff was keeping him informed about Passwater's condition on the 16th. And a reading of the plaintiff's expert's report, Dr. Lampkins and Dr. Berger, as we've already established, the dosages were appropriate for Mr. Passwater. Dr. Lampkins in particular testified that it was unclear if the guidelines that were in place for monitoring to ensure that the adequate de-escalation following the medication administration were followed. That was not relating to Dr. Ripoteau. That was relating to the nursing staff and the custody staff. And again, Dr. Lampkins, who was plaintiff's expert, he was not making this decision or even kind of this questioning about the nursing staff and custody staff not coming to this conclusion saying that they did, but it certainly wasn't about did Dr. Ripoteau do it or not do it. Does any professional organization set national standards for psychiatric care for people who are incarcerated? Do you know? In terms of is there any organization that sets the psychiatric care? Not to my knowledge, but not that I saw, at least in the record that was presented during this case and my review of the case. Is it common for Indiana to engage a psychiatrist about 800 miles away to care for its prisoner population? Is it common in my experience? I don't know. But it certainly happened here, and again, Dr. Ripoteau testified that he had been in place through his employment with the Indiana Minority Health Coalition, had been for a number of years, and had been working with the patient population at Plainfield Correctional, had a working relationship with the staff there. I want to be cognizant of my time for Mr. Hunter, but we would ask that the court should affirm that this report's granting of summary judgment as to Dr. Ripoteau. Thank you so much, Your Honors. Okay. Thank you, Ms. Johnson. Mr. Hunter. May it please the court, Kyle Hunter for the State Defendant. This court should affirm the district court for either of two reasons. Mr. Hunter, can I ask you a question regarding the litigation? What is the constitutional violation with respect to the deputy warden? It seems to be that the alleged violation here is that a two-hour policy instead of a four-hour policy was used for suicide watch companions, and there's no constitutional right to a specific policy, especially one less than four hours. I mean, it seems like that's the argument, right? Like the plaintiff has a constitutional right to a two-hour watch window instead of a four-hour watch window. Yeah, that seems to be the argument to me as well. And I think Judge Lee keyed in on the question of observation, and there's nothing in any of the designated evidence that suggests that Deputy Warden Pretorius was on notice, that there was any problem with the observation in the four-hour window. I mean, that's assuming there's a constitutional violation. That's assuming there's a constitutional violation. And here, absolutely, there's no violation. But also, there's no clearly established constitutional right to anything less than a four-hour suicide watch companion. And as Judge Lee pointed out, even if she would have enforced the purportedly constitutional two-hour policy, it still would have been the same injury.  It started before. And I do also want to point out that there were other redundancies as well. The facts indicate there were other redundancies for observation. The control room has video surveillance of the cells. There are six cells in Plainfield, and there's an officer designated to watch that way. The staff is supposed to check in on the suicide watch companions every 30 minutes. And certainly, in this instance, what happened on the 16th was terrible. But Deputy Warden Pretorius had no personal involvement, and her and the warden are the only named defendants from the state in this case. So you said that there's an officer that's supposed to be watching the videos. Do you know why the person didn't, or maybe that's how they discovered it? In the record, it indicates that they were doing paperwork and not observing. But again, there's no indication that Deputy Warden Pretorius knew of any problem with observation. And actually, if you go back to the e-mails, it indicates that subordinate staff said in the e-mail specifically, Ms. Sinneres indicated that she would, quote, ensure that they were watched either with an open or closed door. So Deputy Warden Pretorius's subordinate indicated that they would make sure observation, even if it was a two- or four-hour policy. So there's no clearly established right, and there's no constitutional violation. And in addition, there are these redundancies that protect against the question of observation, which Judge Lee identified. You know, when I read about the custodian, the inmate custodian program, I hadn't really come across anything like that before. Is the program designed to address kind of a lack in staffing, or is it designed to provide kind of another kind of layer of protection? Do you know what the genesis of it is? I don't know the genesis of it, but according to the policy, it is one of these redundancies meant to ensure that people that are on suicide watch have observation. And, again, Deputy Warden Pretorius had no knowledge that there was a problem with observation, only this difference, which is not a constitutional right of the two to four hours. And do you know whether the facility had prior problems with Mr. Fox fulfilling his duties as a custodian? There's no indication in the record of that, or that Deputy Warden Pretorius knew anything about that. If there are no further questions, the State asks that you affirm the district. Thank you, Mr. Hunter. Mr. Burkhart, we'll give you two minutes for rebuttal. As to Dr. Rippino, the Eighth Amendment requires adequate medical care. He designated no evidence, no affidavit of him, a nurse, of any care after the administration of the medication. The EMRs show no medical care after that. So we think clearly there was a known risk, and he intentionally disregarded that. As to the issue on the clearly established right, we don't go down to that granular level of two hours versus four hours. What we have here is a known systematic lapse in policy. Is that the constitutional violation, a known systematic lapse in policy? The courts have said that's substantive. Which court? Which case? Well, this court in Sinn and in Steigel both recognized that a prison official can be liable for a constitutional violation if there were a systematic lapse in enforcement of a policy. Critical to ensuring inmate safety. Yet failed to enforce it. Right. But that critical to ensuring inmate safety is really important, because here the argument is that the two-hour policy is sufficient, but the four-hour policy is not. And so that two-hour window is critical to enforcing inmate safety. And that's exactly what the EMRs show. The reason for that two-hour policy from Mr. Links, who trained these people who knew about it, and said we have complacency for four hours, and you're standing in this small window. So we make it two hours to ensure the safety of the people who are on constant suicide watch with the door closed. That's a very narrow subset, and that's the critical safety net that they provide. And the email, the March 13th email, the March 13th, 2000 email from Links to the addressees, including Deputy Warden Pretorius, that starts Ms. Senares. Again, I'll defer to Deputy Warden DeWayne on continuing the 24-hour watch on your staff issues. But as I read the email, Mr. Links was telling Ms. Senares, look, the two-hour policy is in place as of now, and this is what you should abide by. And that's in March 13th, 2024, before this incident. Shouldn't that have given Deputy Warden Pretorius comfort or assurance knowing that the two-hour watch is going to now be followed by Ms. Senares because she was told that that's the policy? I don't see how the – it seems like to the extent that there was kind of a deviation from that policy, in the March 13th email, Mr. Links made it clear to everyone, look, you know, the two hours is the two hours. And so I have a hard time understanding how that email chain would give Deputy Warden Pretorius knowledge that even afterwards there would be a failure to comply with the two-hour policy. Because within those emails it also says, I went down and spoke with custody staff and mental health staff and couldn't find anyone who was aware of it. So that is communicated to the Deputy Warden who knows we've got a systematic problem. And then they have that suicide prevention meeting in March where that's the whole purpose of that suicide prevention committee, is to handle things like this. And so that – she had knowledge of that and you look at the minutes, it was never raised. There was nothing to say, go out and tell this staff, here's the two-hour policy, here's how it's implemented. She knew about it and did nothing. Everyone wants to pass the buck. And that's what – that's what this resulted in, a lack of enforcement. And the court should reverse. Thank you. Okay. Thank you, Mr. Burkhart. The court will stand in five-minute recess.